STATE, Respondent, v. VAN LANINGHAM, Appellant.

(No. 4,146.)

(Submitted April 29, 1918. Decided May 20, 1918.)

[173 Pac. 795.]

*Criminal Law—Murder—Motive—New Trial—Newly Discovered Evidence—Rule—Insufficiency of Affidavits.*

Murder—Jury Questions—Motive—Youth of Defendant.
　　1.　In a prosecution for murder, defendant's youth, the fact that the evidence against him came from persons not above suspicion, and that no motive adequate to a cautious or well-balanced mind was established, were matters for the jury's consideration in the first instance, and for that of the trial judge on motion for new trial.

　　[As to necessity of proving motive in prosecutions for murder, see note in Ann. Cas. 1912C, 236.]

Same—Motive—Proof Unnecessary.
　　2.　The state is not required to show an adequate motive before defendant may be convicted of murder.

Same—New Trial—Newly Discovered Evidence—Rule.
　　3.　Motions for new trial of criminal cases because of newly discovered evidence are not favored; in passing on them the courts are bound by the rules that the new evidence must have come to the knowledge of the applicant after trial; that failure to discover it sooner was not due to want of diligence; that it is so material that it would probably produce a different result upon another trial; that it is not cumulative merely; that the application must be supported by the affidavit of the witness; that the evidence must not be such as will tend only to impeach the character or credibility of a witness, and that it will likely be available on another trial.

Same—Newly Discovered Evidence—Proper Denial of New Trial.
　　4.　Where certain items of alleged newly discovered evidence were cumulative in character, and as to others no satisfactory showing of diligence to discover them before trial was made, the motion for new trial was properly denied.

Same.
　　5.　A declaration, said to have been made after trial, by the former wife of decedent, that "they had got the wrong man," but denied by her in a counter-affidavit, was insufficient to warrant a new trial on the ground of newly discovered evidence, in view of the circumstances under which it was alleged to have been made.

Same.
　　6.　Where the jury knew that one of the state's witnesses was in jail on a felony charge and had been made a cell mate of defendant in order to obtain information, matter urged as newly discovered evidence to the effect that the witness had agreed to plead guilty and

On proof of *corpus delicti* in homicide, see subdivisions of note in 68 L. R. A. 34, 46, 57.

On particular application of rule of criminal liability of children to murder, see note in 36 L. R. A. 200.

On cumulative evidence as grounds for new trial in criminal cases, see note in 46 L. R. A. (n. s.) 903.

was thereafter discharged without trial went to his credibility, which had been thoroughly canvassed before the jury, and was insufficient to command a retrial.

Same.

7. A new trial was properly refused where the alleged newly discovered evidence was of such unsubstantial character as to render a different verdict improbable.

Same—Experiments—Newly Discovered Evidence—Insufficiency.

8. Retrial on the ground of newly discovered evidence touching an experimental horseback ride from the scene of the murder to defendant's house, *held* properly denied where the conditions under which it was made were dissimilar from those prevailing when defendant was shown to have made it, and where the witness' affidavit amounted to an expression of opinion contrary to that given by him at the trial.

Same—What not Newly Discovered Evidence.

9. Statements of persons which were known to counsel for defendant before the close of a murder trial did not constitute newly discovered evidence.

*Appeal from District Court, Custer County; Daniel L. O'Hern, Judge.*

GEORGE VAN LANINGHAM, *alias* Jack Logan, was convicted of murder, and from the judgment and an order denying new trial he appeals. Affirmed.

*Mr. Sharpless Walker* and *Mr. W. C. Packer,* for Appellant, submitted a brief; *Mr. Walker* argued the cause orally.

In a homicide case where all of the circumstances relied upon to prove guilt are not consistent with each other, with the hypothesis of guilt, and inconsistent with any other rational conclusion; or where under the evidence any one of several others might have committed the crime; or where the testimony on the part of the prosecution is inherently improbable and contradicts prior statements of the same state's witnesses; or where the motive and opportunity are not clearly shown; or where the defendant is not directly connected with the crime by credible testimony; or where the facts generally are involved in mystery and uncertainty,—which said conditions exist in this case, —the evidence is insufficient to sustain conviction, and on motion a new trial should be granted. (*State* v. *Suitor,* 43 Mont. 31, Ann. Cas. 1912C, 230, 114 Pac. 112; *People* v. *Kennedy,* 7 Cal. Unrep. 184, 75 Pac. 845; *State* v. *Pagano,* 7 Wash.

549, 35 Pac. 387; *Piel* v. *People,* 52 Colo. 1, 119 Pac. 687; *Lonergan* v. *State,* 111 Wis. 453, 87 N. W. 455; *Casey* v. *State,* 20 Neb. 138, 29 N. W. 264; *State* v. *Clouser,* 69 Iowa, 313, 28 N. W. 615; *People* v. *Hare,* 57 Mich. 505, 24 N. W. 843; *People* v. *Campagna,* 240 Ill. 378, 88 N. E. 797; *Schusler* v. *State,* 29 Ind. 395; *State* v. *Dipley,* 242 Mo. 461, 147 S. W. 111; *Hall* v. *Commonwealth,* 149 Ky. 42, 147 S. W. 764; *Satterwhite* v. *State,* 77 Tex. Cr. 130, 177 S. W. 959; *Perkins* v. *State* (Miss.), 23 South. 579; *Tilley* v. *Commonwealth,* 90 Va. 99, 17 S. E. 895; *State* v. *Cremeans,* 62 W. Va. 134, 57 S. E. 405.)

Where the evidence on which a motion for a new trial is based has been discovered since the trial; is such that it could not have been obtained by reasonable diligence before; is material to the issues involved, and goes to the merits; is not merely cumulative, impeaching or contradictory; is shown by the best evidence of which the case admits; and would probably produce a different result upon retrial,—all of which said conditions exist in this case,—a new trial should be granted. (*State* v. *Matkins,* 45 Mont. 58, 121 Pac. 881; *Cahill* v. *E. B. & A. L. Stone Co.,* 167 Cal. 126, 138 Pac. 712; *People* v. *Benham,* 30 Misc. Rep. 466, 63 N. Y. Supp. 923; *State* v. *Stowe,* 3 Wash. 206, 14 L. R. A. 611, 28 Pac. 337; *State* v. *King,* 27 Utah, 6, 73 Pac. 1045; *State* v. *Keleher,* 74 Kan. 631, 87 Pac. 738; *Cantrell* v. *State,* 12 Okl. Cr. 534, 159 Pac. 1092; *State* v. *De Marias,* 27 S. D. 303, Ann. Cas. 1913D, 154, 130 N. W. 782; *Bailey* v. *State,* 36 Neb. 808, 55 N. W. 241; *Myers* v. *State,* 111 Ark. 399, L. R. A. 1915C, 302, 163 S. W. 1177; *Cockrell* v. *State,* 71 Tex. Cr. 543, 48 L. R. A. (n. s.) 1001, 160 S. W. 343; *Williams* v. *State,* 99 Miss. 274, 54 South. 857; *Carr* v. *State,* 106 Ga. 737, 32 S. E. 844, 11 Am. Crim. Rep. 613; *Keenan* v. *People,* 104 Ill. 385, 4 Am. Crim. Rep. 434; *Dennis* v. *State,* 103 Ind. 142, 2 N. E. 349, 5 Am. Crim. Rep. 469; *State* v. *Naylor,* 5 Boyce (Del.), 99, 90 Atl. 880; *Anderson* v. *State,* 43 Conn. 514, 21 Am. Rep. 669; *Read* v. *Commonwealth* (Va.), 22 Gratt. 924; Hayne's New Trial and Appeal, sec. 88.)

*Mr. S. C. Ford,* Attorney General, *Mr. A. A. Grorud,* Assistant Attorney General, and *Mr. Frank Hunter,* County Attorney of Custer County, for the State, submitted a brief; *Mr. Hunter* argued the cause orally.

The evidence in a criminal case need not exclude the possibility of innocence. (*United States* v. *Green,* 220 Fed. 973.) Motive need not be proved in order to sustain a conviction of murder. (*People* v. *Owens,* 132 Cal. 469, 64 Pac. 770; *People* v. *Weston,* 169 Cal. 393, 146 Pac. 871; *Shepherd* v. *People,* 19 N. Y. 537, 544; *People* v. *Bennett,* 49 N. Y. 138; *People* v. *Minisci,* 12 N. Y. St. Rep. 719, 46 Hun, 682; *Thurman* v. *State,* 32 Neb. 224, 49 N. W. 338.)

Where the truth of the alleged newly discovered evidence is utterly inconsistent with want of knowledge thereof prior to the trial, its showing was held insufficient. (*People* v. *Cesena,* 90 Cal. 381, 27 Pac. 300.) Where a witness was produced at the trial, it was held to have been negligence in the party not to have examined him fully. (*Arnold* v. *Skaggs,* 35 Cal. 684; and see *People* v. *Miller,* 33 Cal. 99; *Smith* v. *Smith,* 119 Cal. 183, 48 Pac. 730, 51 Pac. 183.) Where the alleged newly discovered evidence was so closely related to what the witness had testified to at the trial that it might have been brought out on cross-examination, it is not available as ground for new trial. (*People* v. *Phelan,* 123 Cal. 551, 56 Pac. 424.)

In *Kenway* v. *Hoffman,* 51 Wash. 105, 98 Pac. 98, it was held that where affiants were witnesses at the trial and the new matter was entirely open for investigation then, diligence was wanting, and the evidence cannot be said to be newly discovered.

As a general rule, newly discovered evidence of contradictory statements made by a witness after the trial is not ground for a new trial. (*Leyson* v. *Davis,* 17 Mont. 220, 31 L. R. A. 429, 42 Pac. 775; *Husted* v. *Mead,* 58 Conn. 55, 19 Atl. 233; *Lasseter* v. *Simpson,* 78 Ga. 61, 3 S. E. 243; *Tobin* v. *People,* 101 Ill. 121; *Commonwealth* v. *Randole,* Thach. C. C. (Mass.) 500; *Sims* v. *Sims,* 12 Hun (N. Y.), 231; *Dexter* v. *Handy,* 13 R. I. 474; *Johnson* v. *A. Leffler Co.,* 122 Ga. 670,

50 S. E. 488; *Chatfield* v. *Lathrop,* 6 Pick. (Mass.) 417; *Duryee* v. *Dennison,* 5 Johns. (N. Y.) 248.) If the affidavits offered in support of the application are inherently improbable or inconsistent, or are rebutted by counter-affidavits, a new trial will be refused. (29 Cyc. 905.).

Evidence of admissions made by the successful party after the trial or of subsequent declarations inconsistent with his testimony on the trial is not cause for setting aside the verdict. (29 Cyc. 907; *State* v. *Anderson,* 14 Mont. 541, 37 Pac. 1; *Blake* v. *Rhode Island Co.,* 32 R. I. 213, Ann. Cas. 1912D, 852, and note, 78 Atl. 834.)

MR. JUSTICE SANNER delivered the opinion of the court.

Paul Schultz, a drayman of Miles City, was last seen alive between 8 and 9 o'clock in the evening of November 29, 1916. On the next morning at about 7 o'clock he was found dead in his barn, the circumstances indicating murder. For this murder one George Van Laningham was apprehended, tried, convicted and sentenced to life imprisonment. From the judgment as well as from an order denying him a new trial he appeals, insisting upon a reversal because the evidence is insufficient and because of newly discovered evidence warranting a retrial of the case.

I. The *corpus delicti* is conceded, and properly so, we think. Schultz was killed by a series of blows upon the fore part of the head. His body was found just inside the door of the barn lying on its back. Under his head was a horse blanket which the night before had been hanging up in the corner of the barn. The horses were loose. The electric light bulb, which hung out of reach, and which was operated by a switch near the door, was broken, its glass scattered about the floor. The blows which killed Schultz could conceivably have been kicks from a horse, but the circumstances, positive and negative, are sufficient to sustain the view that they were of human origin and were delivered by someone lying in wait. To connect the appellant with the deed the evidence, in brief, was this: Schultz, though

married, was living alone on the lot where his barn is situate. His habits were notoriously regular, and among them was to turn on the water for his horses at approximately 9 o'clock. The customary sound made by this operation was heard by neighbors on the same pipe-line on the evening of November 29 at 9:05. Schultz was well known to the appellant, who went by the name of Jack Logan. The latter was in Schultz's employ, staying at the family homestead, a road ranch twelve miles from town, where Schultz's wife was living, and where she and the appellant maintained illicit relations. The appellant had twice made remarks of a threatening character about Schultz. One of these was in connection with the trading off by Schultz of a gray horse called "Comet," the appellant saying that if this was done he would "fix the little Dutch son-of-a-bitch." The other was in connection with a break-down of a Ford machine belonging to Schultz, the appellant remarking in answer to Mrs. Schultz's expressed fears of Paul's wrath: "You needn't mind being scared of Paul; the next time you see him you won't be scared of him." On November 29, about 9:30 in the morning, the appellant and Mrs. Schultz started on a search for horses. They circled a distance of not more than fifteen miles, the appellant riding a bay mare called "Weazel." They stopped at Daly's for noon, and went to Hopper's, where they gathered two of their horses. On the way back, but some miles from the Schultz place, they saw some horses a short distance off which they thought might be others they were after, but did not go to them. They returned to the ranch between 3 and 4 o'clock, the appellant still riding Weazel. Here the appellant changed to the gray horse Comet and left again, saying he would not be gone long, but would bring back the horses they had seen on the way over. He returned about 11 o'clock without any horses. To ride from the ranch to Miles City, be there as late as 9:30, and return to the ranch about 11 was entirely possible, and appellant's subsequent efforts to account for his whereabouts during the period of his absence from the ranch were so unsatisfactory as to create the impression that

he could not safely tell the truth. Among other things, he persisted, until confronted by irrefutable proof, in the assertion that he did not return with Mrs. Schultz to the ranch, but left her on the way over from Hopper's to go after the horses they had seen, and that he had not mounted Comet at all on that day. He also induced Ray Wilson, a neighbor, to falsely say, for a time, that they had met near the Schultz ranch at about 8 o'clock that night. At 6:30 in the evening of November 29 Schultz had in his possession a $10 gold certificate. No such certificate was found the next morning upon his body or among his effects. On December 1 the appellant met Mrs. Schultz in Miles City and asked her if she had gotten the $10 bill out of the stovepipe hole at the ranch-house. She did not know that such a bill was there, but she at once dispatched a messenger thither at a cost of $6, who found a $10 gold certificate at the place mentioned, returned with it, and gave it to Mrs. Schultz, who immediately changed it into silver. On the same day, at another time,, after she, but before he, had talked with the sheriff, he asked her what she had told the sheriff. She narrated what she had said, not word for word, but substantially. About two weeks after the murder the appellant left the state for his parents' home in Missouri, taking with him the clothes and some trinkets belonging to Mrs. Schultz; and the next day Mrs. Schultz followed him there. While there the appellant told her at least twice that he had killed Paul Schultz, demanding that she give him $1,000 and certain property, else he would deliver himself up and say that she hired him to do it. On one of these occasions he told her that he had left town by the old (and less frequented) route, that he broke the light in Paul's barn, and that when Paul came in to turn on the light he hit him. Frequently, commencing with the summer of 1916, the appellant and Mrs. Schultz had talked of her relations with Schultz, of Schultz's unwillingness to free her and divide the property, and of the fact that upon appellant's father's place in Missouri there was a mortgage of $1,000 which appellant was anxious to lift. Mrs. Schultz and the appellant were both ar-

rested early in January, 1917. On the way back the appellant, responding to the questions of the officers, gave an admittedly false account of his doings and whereabouts on the afternoon and evening of November 29. Incarcerated in the county jail at Miles City, the appellant was given a cell mate named James Smith, who knew nothing of the facts or details of the murder, but who was directed to learn what he could from the appellant. They had several conversations, the substance of which Smith gives thus: "I accused him of the killing of Schultz, and he never denied it, but he never owned up to it. I accused him time and again for being such a cold-blooded murderer, but he never said he didn't and he never said he did. Lots of stuff was said between us. We talked about the town that he was arrested in back in Missouri. He said he saw Lena Schultz in jail in Missouri. I asked him if he thought Lena would go against him, and he jumped out of the bunk, but didn't say anything except that if Lena should prosecute him she would get herself into it. He told me that while she was in the county jail in Missouri she was lying on the floor crying, and he said there was a door with a crack in it, and he went up and said to her, 'Ain't you sorry now in giving this up?' or 'coughing this up?' I asked him if she knew anything about the case, but he never told me. When I accused him of killing Paul Schultz, sometimes he would laugh, and sometimes he would go in his bunk and lay down, and at last he got awful restless, and I said, 'When you knocked Schultz in the head why didn't you cover him up?' He said, 'I did put a horse blanket under his head to keep the blood from running on the floor.' I asked him if he killed the old man why he did not kill the old lady, and he said, 'It takes time to do that'; and I says, 'You ought to take the time and put her away.' Yes; Logan thought I was crazy; he believed I was off." Upon the trial it developed that the first statement given the authorities by the appellant concerning his whereabouts and doings on November 29 tallied with that given by Mrs. Schultz, and this was admittedly wrong and intended to mislead. It also tallied in a very important

particular, as did his later statements, and his testimony, with what the witness Ray Wilson had told the authorities, but which Wilson pronounced on the stand to have been entirely false and agreed to beforehand. In his testimony the appellant was manifestly unwilling to either admit or deny certain of his previous statements, but stood upon the flat denial that he had killed Paul Schultz or had been in Miles City on the night of the murder and upon an explanation of his whereabouts and conduct which was inherently improbable. In short, the state made a *prima facie* case, and this was strengthened rather than refuted by the appellant himself, whose shifty and · unsatisfactory testimony as a witness in his own behalf is apparent even on the printed page.

It is quite true, as he now insists, that some explanation of [1]  contradictions and evasions is suggested by the fact that he was only nineteen years of age, and was confronted with the most serious charge to which anyone may be subjected; that the evidence against him comes from persons some of whom are not themselves above suspicion, some of whom, like Mrs. Schultz, had also made prior inconsistent statements, and some of whom are contradicted by other evidence, and that no motive adequate to a cautious and well-balanced mind was established. It will answer to say that all this was for the jury in the first instance and for the trial judge upon the motion. They saw and heard the witnesses, and were best able to gauge the value of their testimony. We may, however, add these two suggestions: That no attack upon Mrs. Schultz or Ray Wilson can avail, for, upon the facts established, any complicity on their part is impossible save as accomplices of the appellant, and [2]  that the law does not require an adequate motive to be shown. (*State* v. *Lucey,* 24 Mont. 295, 61 Pac. 994.) Of motives it can be said that they are as various as are human characteristics, and what to us would seem trivial and of no impulsive force might conceivedly appeal to someone else with commanding power. From this point of view the record is not barren. The relations between the appellant and Mrs. Schultz

or his expressed desire for money and property from her may be regarded as at least suggestive.

II.  Motions for new trial because of newly discovered evidence are not favored in the law, and in passing upon **[3]** them the courts of this state are bound by the following rules: That the evidence must have come to the knowledge of the applicant since the trial; that failure to discover it sooner was not due to want of diligence; that it is so material that it would probably produce a different result upon another trial; that it is not cumulative merely—that is, does not speak as to facts in relation to which there was evidence at the trial; that the application must be supported by the affidavit of the witness whose evidence is alleged to have been newly discovered, or its absence accounted for; that the evidence must not be such as will tend only to impeach the character or credibility of a witness, and that it will likely be available upon another trial. (*State* v. *Matkins,* 45 Mont. 58, 68, 121 Pac. 881.)  Viewed in the light of these rules, the order denying a new trial cannot be successfully assailed.  The alleged newly discovered evidence is set forth in twenty-five affidavits, and the showing of diligence in the twenty-sixth.  It is insisted that these affidavits establish or tend to establish the following propositions:

"(1) That Lena Schultz did not learn from the defendant on the morning of December 1 that there was a $10 bill at the ranch, but that she knew and stated on the previous day, before the arrival of defendant in town, that she had such a bill there.

"(2) That the defendant on December 23, 1916, at the Van Laningham place, near Novinger, Missouri, did not make any statements to Lena Schultz, or at all, in relation to the murder of her husband.

"(3) That the defendant did not walk with Lena Schultz from the Van Laningham place to the Pope place on January 5, 1917, or make any admissions or statements to her on said date in relation to the murder.

"(4) That the state's principal witness, Lena Holt, formerly Lena Schultz, before and after the trial made numerous statements at variance with her testimony.

"(5) That the witness James Smith admitted having committed a forgery, and agreed with the county attorney to plead guilty, and that after testifying against the defendant refused so to plead and was discharged without trial.

"(6) That Paul Schultz was not killed at 9:05 P. M., when he went to the barn to water and feed his horses, but some time later, when he started to the pump for a pail of water, and that his body was carried into the barn.

"(7) That the route from Miles City to the Schultz ranch *via* the west Yellowstone bridge and Siem ranch is three miles farther than the direct road, and that it would take two hours and fifteen minutes to make said trip.

"(8) That in view of the testimony of Ike Davidson and of the witness Lena Holt as to the time the former arrived at the Schultz ranch-house on the evening of the murder, and the affidavits of Adolphine Schultz and George Kircher, it would have been a physical impossibility for the defendant to have committed the murder and to have admitted Davidson on his arrival at the Schultz ranch."

To these we may add:

(9) That during the trial Lena Schultz was overheard by Mr. and Mrs. Tiemans to say to her present husband, the witness Amos Holt, "We will swear him so damned far into hell that he will never bother us," Holt answering, "Just leave it to me," and also that Lena Schultz herself was heard on another occasion to say that she was indebted to Ray Wilson in the sum of $500.

Propositions 2 and 3, with the affidavits supporting the same, [4] may be dismissed at once as presenting matters purely cumulative. A clear-cut issue of fact was made upon the trial as to whether the incidents referred to occurred, and the alleged details thereof, *pro* and *con,* were gone into by deposition of some of the very persons who make the present affidavits.

Proposition No. 1 was likewise an issue of fact at the trial. It is based upon affidavits from residents of Miles City, one of whom was a witness whose testimony justified examination along

the very lines here developed. The others were within the range of a diligent investigation before the trial, and no satisfactory showing is made for the failure to have their testimony.

Proposition No. 4 adds nothing new to the case whatever, [5] unless it be the alleged declaration of Lena Schultz after the trial "that they had got the wrong man." This she denies in her counter-affidavit, and the circumstances given in connection with the alleged statement are such that we cannot impute abuse of discretion to the court for accepting her version of what took place.

We are at a loss to appreciate the value of proposition 5. [6] That Smith was in jail on a felony charge was known at the trial. That he was made a cell mate of the appellant in order to get information was also acknowledged. What is now urged merely goes to his credibility, and all the considerations which might affect the credibility of a man in his situation were canvassed before the jury.

Proposition 6 is very important, if true, but the fact stated, [7] to-wit, that Paul Schultz's pail was found in the alley between his house and the pump, is too slender a predicate for the proposition, even if it be conceded, as stated by the deponent, that Schultz's habit was to draw a pail of water the last thing before going to bed at night. It assumes that the pail could have gotten where it was found in no way except that Paul dropped it there as he was struck down in the alley, which is by no means certain, and it leaves out of account the facts that no drops of blood, no signs of a struggle, no impression of a fallen body, no footprints of men, are mentioned at the trial or in the affidavits to show that Paul had been in the alley or was assailed there or carried to the barn; and it likewise ignores the broken light in the barn. As aptly stated by the trial judge, the finding of the pail, standing alone or considered in connection with all the other alleged newly discovered evidence, cannot be regarded "as of such a character as to render a different verdict reasonably probable upon a retrial."

Propositions 7 and 8 rest upon an affidavit by the witness [8] Kircher, touching an experimental ride from Miles City to the Schultz homestead *via* the west bridge. The experiment is indecisive for several reasons. In the first place, it was not made under conditions similar to those predicated in the evidence. He was hampered by snow, had not the same horse, was not the same rider, did not possess the same incentive to hurry. Again, the narrow margin of time depends upon whether it be assumed that appellant returned to the ranch at precisely 11 o'clock or "about 11," as testified, and whether Schultz turned on the water at 9:05, as the Shermans think, or was killed between 8 and 9, as appellant told Mrs. Schultz. The latter hypothesis is not impossible, because the water could have been turned on by the appellant himself. Finally, Kircher's affidavit is in the last analysis a mere expression of opinion, contrary to that given by him upon the trial as well as to other evidence in the case.

As to proposition 9: Lena Schultz and her husband both denied the statements imputed to them in the Tiemans affidavits, [9] and excellent reasons are assigned by the trial judge for refusing credit to the affidavits. It will suffice us to say that the statements, if true and if they applied to the appellant in this case, were known to his counsel before the close of the trial, and are therefore not newly discovered evidence. (29 Cyc. 885.) Regarding the statements imputed to Lena Schultz that she was indebted to Ray Wilson, which were also denied, their office could only be to impeach her or to inculpate both of them; but to inculpate either as an actual perpetrator is upon all the evidence, including that of the appellant, impossible; and to inculpate either as an accessory does not tend in this case to destroy the conclusion that the actual perpetrator was the appellant. Hence these statements are without value as inducements for a new trial.

It is noteworthy that no complaint is made of any rulings in the course of the trial or of the instructions. The appellant

was fairly tried, and painstaking consideration was obviously given to his motion for a new trial.

We find no error. Therefore the judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Rehearing denied June 27, 1918.